## POSSESSION OBTAINED OF A DEED UNDER FALSE PRETENSES.

Circuit Court of Cuyahoga County.

### J. A. C. Golner v. State of Ohio.

Decided, February 13, 1912.

*Criminal Law—Indictment—Inconsistent and Repugnant Counts—Obtaining Property Under False Pretenses—Deed of Farm Without Possession Obtained—Cross-Examination of Accussed.*

1. Three counts in an indictment for obtaining property under false pretenses are not inconsistent or repugnant, the first of which charges that it was falsely represented that Snyder owned property on the lake shore east of Cleveland, the second that Pollock owned property on the lake shore east of Cleveland and the third that Snyder and Pollock jointly owned certain property, describing it, on the lake shore east of Cleveland, the title being in Pollock with authority from Snyder to convey.

2. The crime of obtaining property under false pretenses is made out, if the property obtained unlawfully under the false pretenses is a deed selling and conveying a farm to another, though possession of the farm was never surrendered by the prosecuting witness.

3. The cross-examination of a defendant in a criminal case who offers himself as a witness, as to shady transactions which the questions assume he was connected with, such cross-examination being solely for the purpose of testing his credibility, is limited only by the sound discretion of the court, and a judgment will not be reversed for permitting such cross-examination, unless it appears from the record that such discretion was abused to the prejudice of the accused.

*Westenhaver, Boyd, Rudolph & Brooks,* for plaintiff in error.
*J. A. Cline* and *W. D. Meals,* contra.

Winch, J.; Marvin, J., and Niman, J., concur.

Plaintiff in error was convicted of obtaining property under false pretenses from one E. W. Reeves, who was the owner of a farm of 168 acres in Brecksville township, Cuyahoga county, Ohio.

While numerous false representations are alleged in the indictment to have made and to have induced Reeves to part

with title to his farm, only three of them were submitted to the
jury under the charge of the court. They are as follows:

"That the said Arthur L. Snyder was then and there the
*owner* of a valuable tract of land which had a frontage on the
shore of Lake Erie east of the city of Cleveland, Ohio; that said
Arthur L. Snyder had then and there paid for said real estate
east of the city of Cleveland, Ohio, the sum of more than $10,-
800; that said Arthur L. Snyder had then and there a good and
lawful title to said real estate east of the city of Cleveland,
Ohio, on the shore of Lake Erie, in his own name.

"That said F. Pollock was then and there owner of a valuable
tract of land which had a frontage on the shore of Lake Erie,
which real estate was situated east of the city of Cleveland,
Ohio; that said F. Pollock had then and there paid for said
real estate east of the city of Cleveland, Ohio, on the shore
of Lake Erie, the sum of more than $10,000; that said F.
Pollock then and there had a good and lawful title to said
real estate east of the city of Cleveland, Ohio, aforesaid, in his
own name.

"That certain real estate situated in Willoughby township,
Lake county, Ohio, and known as part of land allotted by the
Willoughby Land & Improvement Company, in tract No. 16, and
being lots Nos. 67, 68, 69, 70, 71, 72, 131, 132, 133 and 136, in
tract No. 16 of said company's survey, and recorded in Lake
county, Ohio, records of plats, was then and there located on the
shore of Lake Erie and was worth the sum of $10,000 and was
jointly owned by said Arthur L. Snyder and F. Pollock and that
the title to the same was in the name of F. Pollock and that F.
Pollock had been authorized by said Arthur L. Snyder to convey
the same by deed to E. W. Reeves; that scows had been sunk
in Lake Erie off the shore of and near real estate which was
owned by the said Arthur L. Snyder; that additional land was
forming in Lake Erie by reason of said sunken scows  and
that said land which was forming would be joined to the land
owned by said Arthur L. Snyder."

It will be noticed that it is not alleged that the land on the
shore of Lake Erie represented to be owned by Snyder was the
same land represented to be owned by Pollock nor is it alleged
that the ten lots in the Willoughby Land & Improvement Com-
pany's allotment were represented to be the same land as that
previously represented as owned by Snyder or by Pollock.

On the trial it was shown in evidence that Golner, having opened negotiations with Reeves with reference to his farm, introduced Snyder to him and the latter, by arrangement with Golner, took Reeves out in an automobile to stop 130½ on the Shore Line Electric Railroad, and there pointed out to him ten lots, five of which bordered the lake for five hundred feet, and falsely represented to Reeves that he owned the said lots.

Snyder also told Reeves that he had paid $10,800 for said lots, and he proposed to give Reeves a mortgage on them in payment for the equity in Reeves' farm, the latter being under mortgage.

Negotiations proceeded for several days, Golner being present and participating in some of them, but Snyder became apprehensive of the situation he was getting into and dropped out of the negotiations.

Thereafter Golner introduced Reeves to Pollock, representing that while Snyder owned the lots, the title was in Pollock, and Pollock was authorized to convey, and Reeves agreeing to the deal, Pollock gave him a mortgage on the ten lots therein described, representing that they were the lots on the lake front at stop 130½, whereas in fact they were ten miles from there and not on the lake front.

Reeves delivered the deed of the farm to Pollock and received the mortgage in question securing certain notes which, it was agreed between Golner and Pollock, should be endorsed by Snyder, but Snyder never endorsed them.

In this state of the evidence it is claimed that there is a repugnancy in the representations relied upon for a conviction, not apparent on the fact of the indictment; that the representation that Snyder owned the lots at stop 130½ is repugnant to the representation that Pollock owned the same lots, and that this repugnancy became material and developed prejudicial error in the charge of the court, for the court charged more than once that the jury might convict if they found *any one or more* of these representations had been made.

This claim of error is somewhat difficult to grasp and express, but may be clearer, perhaps, if stated as follows:

"The court might properly have charged that the jury might convict if it found that the representation had been made that Snyder owned the lots, *or* if it found that the representation had been made that Pollock owned the lots, but it could not convict if it found that both representations had been made, because they are inconsistent and repugnant; both can not be true; one contradicts the other."

One answer to this is that the jury might well have found from the evidence that the representations were not as to concurrent ownership by Snyder and Pollock. It was first represented that Snyder was the owner and thereafter that Pollock was the owner. There is nothing inconsistent in such representations, if it was represented that meanwhile title had passed from one to the other, and said suggestion is borne out by the evidence.

Nor can it be said that if the jury should find that it was represented that Synder once owned the lots and thereafter Pollock owned them, that the representation that Snyder owned them ceased to be material and would not warrant a conviction, for there is another aspect of the representation regarding Snyder's ownership—such representation tended to mislead Reeves into a belief that he was dealing with men of substantial means and evident financial responsibility. He might properly conclude that though Snyder had conveyed the lots to Pollock, the latter had paid value for them which would leave Snyder worth as much in money as he had been worth in land, and he was to have Snyder's endorsement on the notes.

This thought becomes more important in consideration of the next assignment of error.

It is claimed that the indictment does not charge Golner with the crime which the record shows was committed by him.

On this proposition it is argued by counsel for Golner that the only false representation which had a decisive influence upon the mind of Reeves and caused him to part with his property was the representation that the lots described in the mortgage were, in fact, the lots located at stop 130½ which had been pointed out to him by Snyder; that it was this belief which

caused him to part with his title; that without this belief he would not have parted with it, and this false representation is nowhere charged in the indictment, for the indictment alleges only that it was represented that the lots described in the mortgage were on the lake front, and not that they were at stop 130½ and were the same lots pointed out by Snyder.

There is some degree of sophistry in this argument.

We can not know with certainty that only one of the many false representations made to him had a decisive influence upon the mind of Reeves. It may have been and it probably was all of them together which brought about that state of mind which induced him to part with his title.

It is but a matter of evidence that the land represented as owned by Snyder, and pointed out to Reeves at stop 130½ and then represented as owned by Pollock, is the same land as that which was represented as being lake front property and included in the mortgage.

It was alleged in the indictment that it was represented that Snyder was the owner of a valuable tract of land which had a frontage on the shore of Lake Erie east of the city of Cleveland. It was shown in evidence that the land Snyder was represented to own was at stop 130½.

It was alleged in the indictment that Pollock was the owner of a valuable tract of land which had a frontage on the shore of Lake Erie, which real estate was situated east of the city of Cleveland. It was shown in evidence that the land Pollock was represented to own was at stop 130½.

It was alleged in the indictment that the ten lots described in the mortgage were represented as located on the shore of Lake Erie. It was shown in evidence that the particular place on the shore of Lake Erie where they were represented as located was at stop 130½.

There was proof, then, of each representation, and, if the indictment alleges a crime, that crime was proved.

As already said, the representation as to Snyder's ownership of lake front property was not only material as connecting his representation with Reeves' mistake in supposing the land

described in the mortgage was on the lake front, but as inducing him to believe that Snyder was a man of financial responsibility and so, that he could trust him and those who claimed to represent him and be interested with him.

The same may be said of the representation as to Pollock's ownership of the land.

As to the representation that the land described in the mortgage was upon the lake front, that was material, for it is a matter of common knowledge that lake front property near the city has an increased value by reason of said frontage. Its exact location at stop 130½ was not so material, and we can not say that Reeves would not have been induced to part with his property if the land he supposed was described in the mortgage had never been pointed out to him, but all that had been represented was that it had a lake frontage.

The questions thus far discussed cover many of Golner's requests to charge which the court refused to give, and reference will therefore be made only to those requests which involve other questions.

By request number 17 the court was asked to charge that representations regarding the lands described in the mortgage, so far as they related to the *joint* ownership of said lots and the authority of Pollock from Snyder to convey said lots to Reeves, were *wholly immaterial* because it is not denied in the indictment that *Pollock* had title to said lots, and full authority to convey the same, though the truth of the representation as stated in the verdict is negatived in the indictment.

The representations of joint ownership of Snyder and Pollock and Pollock's authority to convey are not wholly immaterial, for they connect up with the former representations that Snyder was the owner, and make plain the whole scheme of deception planned by Golner, one inducement and one representation naturally leading on to another, the whole having such consequence as to induce Reeves to part with his property, but being so insidiously interwoven that we can not say that any one representation would have induced Reeves to act; or that he would not have acted if any one representation had not been

made. This inquiry was properly put before the jury for its final answer.

Pollock's sole and undivided ownership of the lots described in the mortgage needed no denial, for no such representation had ever been made to Reeves. If it had been made it would undoubtedly have made him suspicious, for he had previously been told a different story.

By the twenty-second and twenty-third requests the jury's attention was called to the defendant's claim that Reeves never parted with the possession of his farm.

As the charge in the indictment was only that by reason of the false pretenses, the defendant unlawfully obtained from Reeves a deed of general warranty, selling and conveying his farm to Pollock, these requests were properly refused. *State* v. *Toney,* 81 O. S., 130.

The defendant twice submitted his requests to charge, once before argument and again, the same requests, after argument.

The court refused to give the requests before argument though some of them were given after the argument.

We are content to let this question rest upon the decision in the case of *Umbenhauer* v. *State,* 4 C. C., 378, where it was held:

"Upon the trial of a *criminal* case it is not error for the court to refuse to instruct the jury, at the request of the defendant, upon matters of law, before the argument begins."

That case was affirmed by the Supreme Court without report, 23 W. L. B., 167.

The defendant submitted himself as a witness in his own behalf and was cross-examined by the prosecuting attorney; in that cross-examination he was asked many questions with regard to a shady transaction about some Beach City bonds, with which the state tried to connect him. Most of his answers were denials but it is claimed that it was wrong to permit inquiry as to this collateral matter, for it amounted to an attempt to prove another distinct offense, for the purpose of raising the inference of the prisoner's guilt of the particular crime charged, which would

be prejudicial error, as explained in the case of *Hanoff* v. *State,* 37 O. S., 178, at page 180.

A reading of the remainder of said opinion, however, shows that such examination of a witness, whether defendant or not, for the purpose of testing his credibility, rests in the sound discretion of the court, and a judgment will not be reversed for permitting such cross-examination, unless it appears from the record that such discretion has been abused to the prejudice of the party.

There was no such abuse of discretion in this case; such answers as Golner gave to questions asked him probably tended to shake the confidence of the jury in his credibility and were legitimate for that purpose.

The weight of the evidence in this case is so overwhelming as to the guilt of plaintiff in error, that that question has not been raised in this court. The several technical objections raised by his counsel have not been without difficulty, but, being of opinion that there is no reversible error in the record, the judgment is affirmed.